# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

MARILYN GIDEON

    Plaintiff,

vs.

RITE AID OF OHIO, INC., et al.

    Defendants.

Case No. 1:08cv426

Judge Michael R. Barrett

## ORDER

This matter is before the Court on a Defendant's motion for summary judgment (Doc. 31). Plaintiff filed a memorandum in opposition (Doc. 39) to which Defendant replied (Doc. 45). This motion is now ripe for review.

    I.    RELEVANT BACKGROUND FACTS

Plaintiff's amended complaint alleges the following claims: Age Discrimination in violation of the ADEA and O.R.C. Chapter 4112, Gender Discrimination in violation of Title VII and O.R.C. Chapter 4112, FLSA and O.R.C. Chapter 4111 Retaliation, and Wrongful termination in violation of Ohio public policy (Doc. 17). However, in Plaintiff's memorandum in opposition to Defendant's motion for summary judgment, Plaintiff does not dispute summary judgment on the following claims: FLSA and O.R.C. Chapter 4111 Retaliation and Wrongful termination in violation of Ohio public policy (Doc. 39, FN1). Therefore, the age and gender discrimination claims are the only claims remaining.

    A.    Gideon's Career.

Plaintiff, Marilyn Gideon, was born in 1950 and began working for Defendants

(hereinafter, at times, "Rite Aid") as a cashier immediately after she graduated high school in 1969.[1] (Gideon Dep. pp. 19-20.) Gideon earned a promotion to Assistant Manager and then to Store Manager. (Gideon Dep. pp. 19-20.) She managed Store 3139 in Kettering, Ohio for approximately twenty-five years. (Gideon Dep. pp. 10, 20.) There is no dispute that under Gideon's management, Store 3139 was a profitable, high volume store, and was consistently rated very high on customer service. (Gideon Dep. pp. 10, 13; Byerly Dep. pp. 117-118.) Gideon also earned many favorable performance reviews and performance based bonuses. (Gideon Dep. pp. 10, 117-118; Byerly Dep. pp. 62-64.) She was never formally disciplined during her tenure at Rite Aid. (Byerly Dep. p. 80.)

        B.        Byerly Becomes District Manager.

Garry Byerly was named District Manager of the Dayton area and began supervising Gideon in 2002. (Gideon Dep. p. 21.) Gideon argues that Byerly liked to try to intimidate the older female workers by yelling, cussing, throwing things, and making threats, including threatening older females with their jobs and threatening physical harm. (Gideon Dep. pp. 45-46; Hirst Dep. p. 42.) For example, when Byerly first came to Gideon's store, he went an area of the store where inventory is stored and started using the "F word," and throwing down multiple big boxes of summer shoes which split open on impact. (Gideon Dep. p. 42; Compton Dep. pp. 31-32.) On another occasion, Byerly told Gideon that she needed to make her employees "do what she wanted them to do" by growing "a pair of balls." (Gideon Dep. pp. 13, 45.) Byerly also treated other older female employees in a similar fashion. (See Lawwill Dep. pp. 19-41, 69; Ream Dep. pp. 29-33; Hirst Dep. pp. 6, 18-19, 24-25, 43.)

---

[1]At the time Gideon worked for Gray Drugs, however, Rite Aid acquired Gray Drugs in the 1980s.

On one occasion, in a rage, he threatened to turn a table over on the managers. (Gideon Dep. p. 115.) Eric Hanson, District Human Resources Manager, regularly attended these meetings, but he did nothing to curb Byerly's conduct. (Lawwill Dep. p. 43; Ream Dep. pp. 64-65.)

Gideon alleges that Byerly held a number of ageist stereotypes and generally perceived Gideon as not open to change, inflexible, closed to new ideas and not willing to embrace current processes. (Byerly Dep. pp. 60-61, 75.) Byerly regularly told Gideon that she was "stuck in the old ways," and that she "wasn't open to change" or to "new ideas." (Gideon Dep. p. 11.) Gideon understood in these comments the clear implication that her age was a negative factor in her performance. (Gideon Dep. pp. 11, 13.) In virtually every performance evaluation Byerly authored for Gideon after 2002, Byerly included comments questioning Gideon's "openness to change," noting an alleged desire to "cling to the 'old ways' of doing things rather than embracing and trying new things," noting an alleged tendency to get stuck in the "same rut," and noting an alleged unwillingness to adapt to current standards. (Byerly Dep. pp. 75-76.) In the last evaluation Byerly authored for Gideon, he noted Gideon "still has much room for growth in the area of embracing change, and not continuing to do things as she has in the past, just because that's how they were done in the past." (Gideon Dep. p. 52; Gideon Dep. Ex. 9.)

In addition, at manager meetings, Gideon states that Byerly talked to men and women differently. Byerly spoke to male managers as if they were knowledgeable and understood his direction whereas he treated women as if they just did not "get it." (Lawwill Dep. pp. 37-38.) However, Plaintiff acknowledged that she understood her option to report inappropriate conduct/harassment/discrimination to her manager, supervisor, Human

3

Resources Manager, the Corporate Human Resources Department, or the Rite Call tollfree hotline and further admitted that she never utilized any of these complaint procedures. (Gideon Dep. pp. 35-36, 38-40; Gideon Dep. Exs.6 and 8).

During the same time frame, Gideon argues that Byerly prevented her from hiring an Assistant Manager despite the fact that her store met the criteria of $15,000 in sales per week. (Gideon Dep. pp. 12-13, 107-108; Byerly Dep. pp. 126-128.)  Under Gideon, Store 3139 did $23,000 in sales per week. (Gideon Dep. p. 12.)  Gideon states she asked to hire an Assistant Manager to no avail. (Gideon Dep. pp. 15-16, 30; Lawwill Dep. p. 66.)  She claims that stores managed by younger males doing less than $15,000 in sales per week, were assigned Assistant Managers. (Gideon Dep. pp. 12-13.)  Byerly states that Gideon did have an assistant manager on and off and that when she was not given one it was because she had several shift supervisors and because Rite Aid was understaffed in the district.  (Byerly Dep. p. 126.)  Also, there were times when Gideon said she did not want an assistant manager. (Byerly Dep. p. 128.)  However, Gideon did have an Assistant Manager during her last year at Store 3139. (Compton Dep.p 79-80.)[2]

    C.    Gideon's Transfer

In October 2007, the Store Manager of Store 3246 was terminated. (Byerly Dep. p. 77.)  Byerly recommended to Hanson that Gideon be transferred from Store 3139 to Store 3246. (Byerly Dep. pp. 68-69.)  Additionally, Byerly recommended that Susan Santell be transferred to Store 3139 from Store 449 and that Vicki Mitchell, who was the Assistant

---

[2] Plaintiff seems to have abandon this argument as support for her age or gender discrimination claims as she does not address it in her brief other than in her factual recitation.

4

Manager at Store 449, be promoted to Store Manager of Store 449. (Byerly Dep. pp. 76-79.) Byerly's recommendation was based on various factors including the proximity of Store 3246 to Gideon's home, her level of experience, the conditions of Store 449 which would provide a good opportunity for a new manager, her performance issues, which Byerly believed were caused, in part, by her remaining in the same store for such a long period of time, and Santell's experience. (Byerly Dep. pp. 68, 76-79.) Hanson agreed with Byerly's recommendation and, in mid-October, Byerly informed Gideon that he had decided to transfer her to Store 3246. The transfer was effective a few days later, on October 21, 2007. (Gideon Dep. pp. 76-77; Gideon Dep. Ex. 15.) During this discussion, Gideon admits that Byerly told her that the transfer would be, in his opinion, good for her. However, Byerly offered no other explanation to Gideon for his decision. (Gideon Dep. pp. 10-11, 77.) Both Plaintiff and Santell objected to the transfers. (Gideon Dep. p. 77; Santell Dep. pp. 4, 26.)

After learning of her transfer, Gideon sent an e-mail to Regional Vice President John Niccora objecting to the it. (Gideon Dep. p. 78.) Specifically, she claimed that she was too old to go and "clean up" a store and that Byerly should send one of the "younger guys with more energy." (Gideon Dep. Ex. 16; Gideon Dep. p. 78.) Additionally, Plaintiff objected because of the extra seven minute commute that the new store was from her home, and because she was "getting close" to retirement. (Gideon Dep. pp. 79-80.) In her letter, Gideon did not articulate any discriminatory concerns, nor did she put forth any concerns about Byerly.

At Store 3246, Plaintiff supervised approximately 10–12 associates and had an Assistant Manager. After her transfer, her pay remained the same and her schedule was

no less desirable to her. (Gideon Dep. pp. 31-32.) However, Gideon argues that since Store 3246 is less profitable that her annual performance bonus would be negatively affected. (Gideon Dep. pp. 11, 89-90, 117.) Gideon was also concerned about the location of the new store given that it was in a less safe neighborhood and had previously been robbed. (Gideon Dep. pp. 89-90.)

        D.      Gideon's Terminations.

During her employment with Rite Aid, the terms and conditions of Gideon's employment were governed by Rite Aid's employee handbook, called the Associate Atlas, as well as various policies and procedures that were developed and enforced by the Company regarding workplace issues. (Gideon Dep. pp. 33-34; Gideon Dep. Ex. 7.) The Associate Atlas contains a policy related to work hours and recording time that clearly articulates that falsification of a time record, regardless if that falsification results in more or less paid hours, is a breach of the company's policy and is grounds for disciplinary action, up to and including discharge but does not specifically include a "zero tolerance" policy. (Gideon Dep. p 132; Ex. 6, p. 20.) Additionally, the Timekeeper Administration Policy provides that a manager may be disciplined, up to and including discharge, for (1) allowing an associate to work off the clock, (2) improperly modifying an associate's time, (3) improperly reporting an associate's time off, or (4) failing to enforce the policy. (Gideon Dep. pp. 59, 116-117; Gideon Dep. Ex. 14.) Plaintiff understood that it was important to Rite Aid, not just that the time worked be captured accurately, but that the procedures for recording the time worked be followed. (Gideon Dep. p. 117.)

Rite Aid uses two computer programs for scheduling and timekeeping. (Byerly Dep. p. 101.) Staffworks helps managers draft schedules and Kronos is a computerized time

6

clock which employees access through the cash register. (Ream Dep. pp. 46-48, 54; Byerly Dep. pp. 101-102, 104.) When an associate forgets to clock in or out using Kronos, it is the Store Manager's responsibility to insert the correct clock in or clock out time. (Hanson Dep. pp. 55-56.) Store Managers, including Gideon and others, had to make these periodic adjustments to make sure all the employees were paid for the hours they worked. (Ream Dep. p. 52; Gideon Dep. p. 110.)

Shortly after transferring to Store 3139, Santell found manual sign-in sheets for associates. (Santell Dep. pp. 23-24.) These manual sign-in sheets had not been authorized for use at Rite Aid for approximately five years, or since the introduction of the electronic time keeping system Kronos in 2002. (Hanson Dep. p. 59.) Additionally, Santell noticed that quite a few of the associates routinely failed to clock in and out. (Santell Dep. pp. 23-24.) Based on advice from Byerly, Santell forwarded the manual sign-in sheets to Hanson. (Byerly Dep. p. 107.) After reviewing the documents forwarded by Santell, Hanson reviewed a report outlining the time punches for associates at Store 3139 over the previous six month period. (Hanson Dep. p. 60.) The information showed that Gideon was manually editing time punches approximately eighty percent of the time, compared to the expected five percent. (Hanson Dep. p. 60, 79; Gideon Dep. Ex. 12). Because of the frequency of the manual edits and the existence of the handwritten sign-in sheets, Hanson began an investigation which included interviewing many of the associates at Store 3139 and asking them to complete a wage and hour questionnaire. (Hanson Dep. pp. 60-64).

During the investigation, Hanson interviewed Gideon. He states that she admitted both orally and in writing that she violated various Rite Aid policies. Gideon adamantly disagrees. Although Plaintiff admits to having maintained manual sign-in/sign-out sheets

7

for her employees at Store 3139, she states that she did so only as back-up, as a "double check." (Gideon Dep. pp. 65-66.) Plaintiff also stated that she was not sure if she communicated Rite Aid's requirement that all associates use the Kronos system exclusively to record their time, however, she does state that she knew that her associates knew of this requirement. (Gideon Dep. p. 67.)

Sheryl Compton, more often than others, forgot to clock in. (Gideon Dep. p. 67; Compton Dep. pp. 41-42.) Gideon had to edit the Kronos records to properly reflect the hours worked by Compton. (Gideon Dep. pp. 67-69, 70, 71.) Gideon repeatedly issued Compton verbal discipline for forgetting to clock in but never any formal type of discipline. (Gideon Dep. pp. 74-75.) Gideon believed that Compton arrived on time since she would have received a "late opening" notice if the store was not opened on time. In addition, since Compton regularly opened the store she also had to disarm the alarm. (Compton Dep. p. 42; Gideon Dep. p. 70; Santell Dep. p. 40; Byerly Dep. p.106.) Thus, her arrival could be verified by reviewing the alarm records. (Gideon Dep. p. 70; Santell Dep. pp. 40-41.) However, Hanson states that Compton admitted to him that she was late to work almost every day. (Hanson Dep. pp. 69-70.) Compton disputes this by stating that she arrived on time "most of the time" (Compton Dep. p. 42) and that she did not tell Hanson otherwise (Id. at p. 51.) After reviewing Compton's time punches, it appeared to Hanson that Gideon would manually clock Compton in at her scheduled time and manually clock her out at the end of her scheduled shift. When questioned about changing Compton's arrival and departure time, Gideon simply said that her concern was that Compton was paid for the correct number of hours. (Hanson Dep. pp. 69-70.)

Rite Aid states that Gideon also reported to Hanson that, on occasion, Debbie

Donaldson would clock out and return to the sales floor to finish her projects. However, both Donaldson and Gideon deny that this occurred. Gideon states that she never allowed any employees to work off the clock. She goes on to state that there may have been nominal occasions where Donaldson worked one, two or three minutes past the end of her shift. (Gideon Dep. pp. 94, 101-104; Gideon Dep. Ex. 17,19).

Based on the information obtained during his investigation, Hanson determined that Gideon had engaged in serious misconduct which included violations of the Timekeeper Administration Policy, falsification of company timekeeping records, and allowing an associate to work "off the clock." Specifically, Rite Aid states that, Gideon violated the Timekeeper Administration Policy by not requiring the associates at Store 3139 to clock in and out on the Kronos system or disciplining them when they failed to do so. (Hanson Dep. p. 66-68). Additionally, she falsified company records by recording that Sheryl Compton arrived on time each day, based on Compton's verbal assurances, even though Compton admitted to Mr. Hanson that she was late almost every day. (Gideon Dep. pp. 67-68; Hanson Dep. p. 69-70.) Finally, Hanson believed that Gideon admitted that she allowed Donaldson to work off the clock. (Plf. Dep. pp. 94, 101-102.) Accordingly, Hanson recommended that Gideon be terminated based on her misconduct. (Hanson Dep. p. 66.) Byerly, who was not involved in the investigation or the decision to terminate Gideon, was then directed to inform her of the termination decision. (Byerly Dep. pp. 99-100.) Because it was close to Christmas, Byerly requested to postpone her termination until after January 1, 2008. However, Byerly was instructed that he could only wait until after Christmas. (Byerly Dep. pp. 100-101.) Accordingly, on December 26, 2007, he terminated Gideon. (Gideon Dep. pp. 96-97.) Then, on Friday, January 18, 2008, in response to Gideon's

inquiry, Hanson forwarded a letter to her outlining additional details about the reasons for her termination. In this letter, Hanson also explained that, under Rite Aid policy, she had the opportunity to appeal her termination to Rite Aid's corporate office. (Gideon Dep. pp. 100-101; Gideon Dep. Ex. 18). Plaintiff did not so appeal. Id. Defendants replaced Gideon at Store 3246 with Joan Vaughn, born 1970. (Pl. Ex. J.)

II. LEGAL ANALYSIS

A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

"In ruling on a motion for summary judgment (in other words, in determining whether

there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also *L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc.,* 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Beatty v. UPS,* 267 F. Supp. 2d 823, 829 (D. Ohio 2003).

B.  Discussion

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Subject to certain exceptions not relevant here, this protection applies "to individuals who are at least 40 years of age." *Id.* § 631(a).[3]

---

[3]The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations

11

A claim of employment discrimination is to be analyzed using the burden-shifting approach in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) where there is no direct evidence of discrimination. Examples of direct evidence are a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), *citing Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) and *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379-80 (6th Cir.1993). Here, the parties agree that there is no direct evidence of discrimination.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by a younger individual or was treated differently than similarly-situated, non-protected employees. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). The *McDonnell Douglas* burden-shifting framework for circumstantial-evidence cases has been applied in the context of claims brought under the ADEA as well. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009).

Rite Aid does not dispute that Gideon is a member of a protected class or that she

---

of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Likewise, this Court may rely on cases interpreting the ADEA in its analysis of Plaintiff's state law age discrimination claim. *Williams v. General Elec. Co.*, 269 F.Supp.2d 958, 966 (S.D. Ohio 2003), *citing*, *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998); *Cochran v. Columbia Gas of Ohio, Inc.*, 742 N.E.2d 734, 738 (Ohio 2000).

was qualified for the position. It does, however, dispute that her transfer was an adverse action while recognizing that her termination is an adverse action. Rite Aid also disputes that she was treated differently than similarly-situated non-protected employees.

An adverse employment action is a "materially adverse change in the terms and conditions of [plaintiff's] employment." *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999). Examples of adverse employment actions include firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575-76 (6th Cir. 2004). Employment actions that are *de minimis* are not actionable. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996). The change in employment terms or conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hollins*, 188 F.3d at 662. The Sixth Circuit has repeatedly found that an involuntary transfer or reassignment, absent loss of pay or benefits, does not constitute a materially adverse change in employment. *See, e.g., Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (finding no materially adverse change where as a result of plaintiff's involuntary transfer to another office, plaintiff suffered no decrease in pay, her job duties were not significantly changed, and the transfer actually reduced her commute); *Bowman v. Shawnee State Univ*., 220 F.3d 456, 462 (6th Cir. 2000) (finding no materially adverse change where plaintiff was removed from coordinator position for only approximately ten days with no loss of income.)

Rite Aid argues that Gideon's transfer does not equate to an adverse action

13

because her hours and pay remained unchanged. Adding that Gideon herself stated that the only difference was that the new store was in a "rough neighborhood." Plaintiff does not address this issue in her brief. The Court notes that there is evidence in the record to suggest that Gideon's end of year bonus, which is based on a store's profit and loss statement and customer service scores, may be less or not given due to the fact that, at the time of her transfer, the new store was not as profitable as the old store. (See Gideon Dep. pp. 10, 117.) However, this evidence is insufficient to constitute a materially adverse change in employment since she would only be entitled to the bonus if she met the requirements of Rite Aid to receive a bonus. See *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) citing *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996)(low performance evaluation and consequent ineligibility for discretionary bonus not actionable adverse employment action.) There is no evidence in the record establishing that Gideon would not receive a bonus at Store 3246 or that she was prevented from taking any necessary steps to increase sales at Store 3246 thereby enabling her to obtain a bonus. Thus, Gideon's transfer is not an adverse action. However, her termination is an adverse action, thus, the analysis continues.

      The final question in the *prima facie* analysis is whether or not Gideon was replaced by a substantially younger individual, a male individual, or was treated differently than similarly situated, non-protective employees. It is undisputed that she was replaced by a substantially younger female. Joan Vaughn, who was born 1970, replaced Gideon at Store 3246 after she was terminated. Thus, Gideon can demonstrate a prima facie case of age discrimination. However, as to her gender discrimination claim, she has failed to show that she was treated differently than similarly situated males.

To be deemed "similarly situated" a plaintiff must establish that all relevant aspects of her employment situation were nearly identical to those she claims are similarly situated. *Ercegovich v. Good Year Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1992). Furthermore, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 352, *quoting Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). It is Gideon's burden to establish that the other employees' acts were of comparable seriousness to her own infraction. *See Warfield v. Lebanon Correctional Inst.*, 181 F. 3d 723, 730 (6th Cir. 1999).

As to Gideon's termination, she has failed to show any males who were similarly situated and treated differently than she was. The comparators that Gideon references in relation to her alleged time clock violations are all female. In addition, Rite Aid provides sufficient evidence to show that men were terminated for similar violations. (See Second Affidavit of Hanson (Doc. 41, Exh. 1.) Gideon attempts to show that she was treated differently than men by showing how poorly Byerly treated women, however, she does not show any specific examples of Byerly treating men better than he did women. In fact, her own testimony includes evidence that Byerly was mean to men as well as women and that many of Byerly outbursts occurred during manager meetings where both men and women were present. (See Gideon Dep. p. 44-45.) Byerly did tell Gideon to "grow a set of balls." However, gender discrimination can not necessarily be inferred from this one statement. As offensive as it may be, the phrase is often use to suggest that one "toughen up," "stand

15

up for yourself", "take charge," "get a spine," etc.[4] Thus, her gender discrimination claim fails.

Since Gideon has established a prima facie claim of age discrimination, the burden now shifts to Rite Aid to show a legitimate, non-discriminatory reason for her termination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). Here, Rite Aid has shown a legitimate, non-discriminatory reason for Gideon's termination. Hanson was provided with manual, paper sign in sheets that Gideon used at Store 3139 and conducted an investigation. Based upon his findings from that investigation, Hanson determined that Gideon had violated company policy and terminated her employment.

Since Rite Aid has articulated a non-discriminatory reason for its actions, Gideon must now prove by a preponderance of the evidence that the legitimate reasons put forth by the Rite Aid were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her remains at all times with the plaintiff. *Burdine*, 450

---

[4]Plaintiff also argues that men were paid more than Gideon. However, she has presented no evidence of any pay disparity. Gideon states that she requested such documentation and that it was not provided by Rite Aid. Even assuming that is true, a response to a motion for summary judgment is not the proper time to make that argument to the Court. Gideon can not now rely on a discovery deficiency when it failed to file a motion to compel or bring the issue to the Court's attention prior to the end of the discovery period.

U.S. at 253. Unsupported speculation cannot form the basis for demonstrating pretext. *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Plaintiff argues that the proffered reason had no basis in fact by arguing that the results of Hanson's investigation as it relates to Donaldson allegedly working off the clock and Compton alleged arriving late to work almost every day were not true. She argues that the proffered reasons did not actually motivate the adverse action by showing that the comments made by Byerly establish pretext. And finally, she argues that the proffered reason was insufficient to motivate the adverse action by showing that other similarly situated managers were not terminated.

The Sixth Circuit has explained that a plaintiff must allege more than a dispute over the facts upon which his or her discharge was based. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). Instead, a plaintiff must put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment action. *Id.* In order to determine whether the defendant had an "honest belief," a court must consider whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *Id.* In *Smith v. Chrysler*, the Sixth Circuit noted that:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

55 F.3d 799, 807 (6th Cir. 1998). This Court must not second guess the business judgment of the employer, but simply evaluate "whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Here, based upon the deposition testimony of Gideon, Hanson and Compton, the Court finds that there is a question of fact as to whether Hanson made a reasonably informed and considered decision since Gideon denies stating many of the allegations that Hanson states she admitted and Compton gives contradictory testimony as well. Although this is sufficient to survive the motion, the Court will address Plaintiff's other arguments as to pretext.

Gideon states that Byerly told her that she was "stuck in the old ways," "not flexible," and "wasn't open to change" or "new ideas." These comments on their face do not show age discrimination. Rite-Aid argues that these comments are in relation to the fact that Gideon had been a long time employee and that she was resisting the new technologies and policies that Rite-Aid was attempting to implement. The evidence supports Rite-Aid's argument. In Gideon's performance evaluations Byerly stated that Gideon "tends to hold on to the way things have been done in the past and seems open to listen to new ways but does not act on them." (Doc. 39, Exh. B.) In *Peecook v. Northwestern Nat'l Ins. Group*, No. 96-4318, 1998 U.S. App. LEXIS 18265, 1998 WL 476245, at *3 (6th Cir. Aug. 3, 1998), the Sixth Circuit found the comment "perhaps you are too old to change" to be "too amorphous to constitute age-based 'harassment.'" Likewise, Byerly comments are too speculative to be considered age-based animus. *See Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 836

(6th Cir. 1996); *Ziegler v. IBP Hog Mkts., Inc.*, 197 F. Supp. 2d 950, 955 (N.D. Ohio 2002).[5]

Plaintiff also argues that other similarly situated managers were not terminated for the same conduct. The facts seem to suggest that there were, in fact, other managers who were supervised by Byerly and who were not terminated for editing time punches. However, Gideon has not shown any evidence that these managers were editing time punches to the degree that she did. Furthermore, Compton testified that the issue of her clocking in on Kronos was not emphasized to her by Gideon. Once Hanson spoke with her about it, she has made a conscious effort to remember to clock in and, in fact, has done a better job of remembering to do so.

In addition, Rite Aid offers the affidavit of Eric Hanson to show that other managers of various ages have been terminated for time keeping violations. (See Doc. 41, Exh. 1.) However, of all the "comparators" that Rite Aid offers, based upon the supporting documentation provided, only two appear to the Court to be similarly situated, Chris Leone and Ruth Johnson. Both Mr. Leone and Ms. Johnson were managers who were terminated for making changes or adjustments to an associate's time record. Mr. Leone was born in 1983 and Ms. Johnson was born in 1955. However, since Mr. Leone was not a member of the protected class and terminated for the same or sufficiently similar conduct, the fact that Plaintiff was also terminated does not tend to show that Defendant discriminated against her based on her age. *See Cookenmaster v. KMart Corp.*, 2008 U.S.

---

[5]Even if these comments did show age discrimination, Plaintiff would have to show that Byerly had a role in the decision making process. According to Hanson, Byerly was not involved in the process. Plaintiff argues that Defendant admitted in response to interrogatories that Byerly was involved. This fact would have to be flushed out.

Dist. LEXIS 78611, *25-26 (E.D. Mich. Oct. 7, 2008).

Finally, Rite Aid Corporation argues that it was not Plaintiff's employer and thus entitled to summary judgment. Gideon counters that there is a genuine issue of fact as to this issue. The Court agrees. (See Gideon Dep. Exh. 18.)

III. Conclusion

Based upon the above discussion, Defendant's motion for summary judgment is GRANTED, in part, and DENIED, in part. This matter shall proceed to trial on Plaintiff's age discrimination claim.

**IT IS SO ORDERED.**

*s/Michael R. Barrett*
UNITED STATES DISTRICT JUDGE